UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YAEL ELMATAD,<br><br>              Plaintiff,<br><br>          v.<br><br>SHUTTERSTOCK, INC. and<br>META PLATFORMS, INC.,<br><br>              Defendants. | Case No.: 1:24-cv-07430<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Yael Elmatad ("Plaintiff"), by and through her undersigned counsel, Grubin Law Group, P.C., hereby alleges as follows Shutterstock, Inc. ("Shutterstock") and Meta Platforms, Inc. ("Meta") (together, "Defendants"):

## NATURE OF THE CLAIMS

1. As detailed below, over the course of the last seven years, Plaintiff rapidly rose up the ranks at GIPHY, Inc. ("GIPHY"), quickly becoming its second-most senior engineer.

2. As Plaintiff was recently made aware, however, she has been grossly undercompensated as compared to her male colleagues for the last four years.

3. Indeed, following the acquisition of GIPHY by Meta in May 2020, Plaintiff was improperly mapped into Meta's organizational structure as Data Science Manager, while several more junior engineers (one of whom Plaintiff had previously supervised) were correctly placed into engineering roles.

4. This resulted in a massive pay disparity between Plaintiff and several male engineers who performed equal or substantially similar work, despite the fact that Plaintiff's job duties never changed (in fact, her responsibilities only expanded).

1

5. The inequitable compensation structure persisted throughout Plaintiff's employment, as Shutterstock adopted it wholesale after acquiring GIPHY from Meta in 2023.

6. This was revealed to Plaintiff in May 2024, when GIPHY's Chief Technology Officer ("CTO") sent her a spreadsheet showing that she was compensated less than her male colleagues to the tune of over $2 million—despite the fact that Plaintiff served in a more senior but otherwise analogous role, had greater responsibilities, more experience, and stronger performance reviews.

7. To redress these wrongs, Plaintiff brings claims for violations of: (i) the Fair Labor Standards Act, as amended by the Equal Pay Act, 29 U.S.C. § 206(d) ("FLSA"); and (ii) the New York Labor Law, N.Y. Lab. Law § 194 ("NYLL").

## JURISDICTION AND VENUE

8. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the FLSA.

9. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under State law.

10. Pursuant to 28 U.S.C. § 1391, venue is proper because Shutterstock resides in this District and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PARTIES

**A.    Plaintiff Yael Elmatad**

11. Plaintiff is a resident of the State of New York.

12. At all relevant times, Plaintiff was an "employee" of Defendants within the meaning of all relevant statutes and applicable regulations thereunder.

B.   **<u>Defendant Shutterstock, Inc.</u>**

13.   Shutterstock is a foreign corporation with its principal place of business located at 350 Fifth Avenue, 20th Floor, New York, New York 10118.

14.   At all relevant times, Shutterstock established, implemented, disseminated, and controlled all of employment policies applicable to Plaintiff.

15.   At all relevant times, Shutterstock controlled and directed the terms and conditions of Plaintiff's employment.

16.   At all relevant times, Shutterstock maintained and exercised the power to hire, fire, discipline, and promote Plaintiff.

17.   At all relevant times, Shutterstock was an "employer" within the meaning of all relevant statutes and applicable regulations thereunder.

C.   **<u>Defendant Meta Platforms, Inc.</u>**

18.   Meta is a foreign corporation with its principal place of business located at 1 Hacker Way, Menlo Park, California 94025.

19.   From in or around May 2020 through in or around June 2023, Meta established, implemented, disseminated, and controlled all of employment policies applicable to Plaintiff.

20.   At all relevant times, Meta controlled and directed the terms and conditions of Plaintiff's employment.

21.   From in or around May 2020 through in or around June 2023, Meta maintained and exercised the power to hire, fire, discipline, and promote Plaintiff.

22.   From in or around May 2020 through in or around June 2023, Meta was an "employer" within the meaning of all relevant statutes and applicable regulations thereunder.

**FACTS**

A. **Background**

23. Plaintiff began working at GIPHY in or around June 2017, after being heavily recruited in light of her exceptional credentials.

24. While she was nominally hired as a Lead Data Scientist, Plaintiff led GIPHY's Search team, managing all of its engineers while simultaneously writing search code herself.

25. Plaintiff's role grew gradually from there, and she eventually began overseeing GIPHY's entire Advertising Technology team (a team within GIPHY's engineering department).

26. This earned her a promotion to Director of Data and, later, Vice President ("VP") of Insights.

27. While Plaintiff's title continually suggested a role limited to data science, she performed work indistinguishable from that of GIPHY's engineers throughout her employment—in addition to her non-engineering work.

28. By 2020, Plaintiff was the second-most senior member of GIPHY's engineering team, reporting directly to the CTO, Randy Shepherd ("Shepherd").

29. For roughly three years, Plaintiff's unparalleled work was recognized through fair and equitable compensation.

30. This changed, however, following the acquisition of GIPHY by Meta.

B. **Meta's Acquisition of GIPHY and Establishment of an Inequitable Pay Structure**

31. GIPHY was acquired by Meta in or around May 2020, after which GIPHY employees were slotted into roles with ostensibly equivalent levels of seniority, responsibility, and compensation within Meta's organizational structure.

32. This mapping process was imperfect, to say the least.

33. Plaintiff went from being VP of Insights at GIPHY to serving in the role of Data Science Manager at Meta.

34. This position was far from equivalent to her pre-acquisition role at GIPHY.

35. As noted above, prior to Meta's acquisition, Plaintiff was in a VP role (the next most senior employee on Plaintiff's team at the time was a Director) and reported directly to Shepherd, GIPHY's CTO.

36. Prior to the Meta acquisition, Plaintiff supervised engineers performing a variety of roles—including front-end, back-end, data infrastructure, and machine learning—as well as one data scientist.

37. Her responsibilities and total reports only expanded further post-acquisition.

38. Despite this, the Data Science Manager role Meta assigned to Plaintiff was roughly equivalent to the pre-acquisition title of Data Analyst—one of the more junior positions at GIPHY.

39. Accordingly, Meta offered Plaintiff a far less lucrative compensation package than she deserved.

40. Plaintiff complained to Shepherd that her job title and compensation did not reflect her seniority, value, or the true nature of her work.

41. Indeed, Plaintiff should have been assigned a more senior engineering role, rather than the role of Data Science Manager.

42. While Shepherd advocated for a re-mapping of Plaintiff's position, Meta demurred that it could not change her role now that the acquisition had closed.

43. To be sure, Meta did increase Plaintiff's signing bonus after Shepherd raised concern about the erroneous mapping of Plaintiff's role.

44. However, as Plaintiff would later learn, this did little to mitigate the pay inequity she was suffering.

45. Despite underpaying Plaintiff, Meta repeatedly acknowledged that her performance was exceptional.

46. Apart from her 2020 mid-year review (at which time she had worked at Meta for less than two months, and was thus rated "Too New to Evaluate"), Plaintiff was rated "Exceeds Expectations," "Greatly Exceeded Expectations," or "Redefined Expectations"—the highest possible rating, which is rarely awarded at Meta—in each of her mid-year and year-end reviews.

C. **Shutterstock's Imposition of the Same Inequitable Pay Structure Following Its Acquisition of GIPHY, and Plaintiff's Discovery of the Same**

47. In or around early 2023, the U.K. Competition and Markets Authority ordered Meta to divest from GIPHY.

48. Accordingly, in or around June 2023, Meta sold GIPHY to Shutterstock.

49. Prior to the closing of the acquisition, a GIPHY executive pointed out to an executive at Shutterstock that Meta had failed to pay certain employees in protected classes equitably and that, as such, Shutterstock was inheriting from Meta foreseeable liability for pay discrimination.

50. Upon information and belief, Shutterstock took no further action to investigate potential pay inequities it was adopting from Meta after receiving this tip.

51. In or around June 2023, Plaintiff began working as a Senior Vice President ("SVP") of Insights at Shutterstock.

52. Approximately six months later, Shutterstock gave Plaintiff the title of SVP of Analytics & VP of Engineering.

53. In doing so, Shutterstock acknowledged that Plaintiff was serving in two full-time roles and that her role had, in fact, been improperly mapped by Meta.

54. Following its acquisition of GIPHY, Shutterstock carried over Plaintiff's and other employees' unvested Meta RSUs by converting them into cash retention payments (the "Retention Payments").

55. Specifically, Shutterstock agreed to tender the Retention Payments to Plaintiff and other employees in amounts equal to the cash value of the RSUs at the time of payment, on the same schedule set forth in Plaintiff's and the other employees' respective Meta RSU award agreements.

56. On or around May 10, 2024, Shepherd shared with Plaintiff a spreadsheet detailing the outstanding Retention Payments owed to her and other employees (the "Spreadsheet").

57. Plaintiff was shocked and dismayed to find that she was being paid considerably less than male employees in equal and even more junior but otherwise analogous roles.

58. Specifically, the Spreadsheet reflects that Plaintiff was underpaid by more than $2 million over the life of the RSU award agreements and subsequent Retention Payments schedule, as compared to multiple male employees on the engineering team—despite the fact that Plaintiff has performed engineering work throughout her tenure at GIPHY, was in an objectively equal or more senior role than her male comparators, and had objectively greater experience and responsibilities.

59. To be clear, Plaintiff was more qualified, more senior, and performed equal if not greater work than these better-compensated men not only at Shutterstock, but also at Meta.

60. For example, the Spreadsheet reflects that Employee A[1] was set to vest approximately 21,510 RSUs over the life of his RSU award agreements.

61. The combined value of Employee A's RSUs and the Retention Payments into which some of those RSUs were later converted equals approximately $5.45 million.

62. Similarly, the Spreadsheet reflects that Employee B[2] was set to vest approximately 21,885 RSUs over the life of his RSU award agreements.

63. The combined value of Employee B's RSUs and Retention Payments equals approximately $5.57 million.

64. Conversely, Plaintiff was set to vest approximately 13,387 RSUs.

65. The combined value of Plaintiff's RSUs and Retention Payments equals approximately $3.39 million—*i.e.*, more than $2 million less than the compensation paid to Employee A and Employee B.

66. This is plainly inequitable.

67. Indeed, Plaintiff was an SVP of Analytics & VP of Engineering, whereas Employee A and Employee B were only VPs of Engineering—with Employee A having been promoted from Director to VP just a few months earlier, in or around February 2024.

68. Further, whereas Plaintiff managed approximately 12 to 15 reports at any given time and reported into Shepherd, the CTO, Employee A managed approximately four reports.

69. Similarly, Employee B managed approximately three to four reports.

70. It also bears noting that, throughout her employment, Plaintiff swapped direct reports with Employee A and Employee B at various times.

---

[1] In an effort to preserve his privacy, Employee A's name has been replaced with pseudonym.
[2] In an effort to preserve his privacy, Employee B's name has been replaced with pseudonym.

71. The fact that Plaintiff, Employee A, and Employee B managed the same employees at different times speaks further to the similarity of their roles.

72. Moreover, Plaintiff has significantly more engineering experience than Employee A, and has attained a higher level of education than Employee B.

73. Plaintiff's performance was also stronger than Employee A's and Employee B's, both at Meta and at Shutterstock, as reflected by their respective performance evaluations.

D. **Shutterstock's Refusal to Address Its Inequitable Pay Practices**

74. After reviewing the Spreadsheet, Plaintiff emailed Shepherd to express her anger at the discovery that she was being paid less than her male colleagues.

75. While she had long suspected a discriminatory pay disparity due to Meta's poor mapping of her role, she never imagined that the disparity would total millions of dollars.

76. Shepherd acknowledged that Plaintiff had been undervalued, but told her that the matter was out of his hands, as Shutterstock had merely adopted Meta's compensation structure.

77. Shortly thereafter, Plaintiff met with Romy Saplicki ("Saplicki"), GIPHY's Director of Human Resources, to escalate her concerns, and followed up with an email providing additional details.

78. As Plaintiff succinctly stated in her email:

> All of these coworkers who make more money than me are men, none of them have ever had a more senior title at GIPHY. I have been managing engineers the longest out of all of us (basically since day 1) and I have the highest and most relevant education . . . My understanding is if the roles we were doing are the same and there isn't something that obviously differentiates them (education, experience, seniority, skills, performance) then there is a strong basis for a claim against a pay gap since the only thing between us is our gender.

79. Saplicki later confirmed to Plaintiff via Slack that she discussed her complaint with Shepherd, who "corroborated [Plaintiff's] story."

80. Around the time she discovered the Spreadsheet, Plaintiff also learned that the 2023 sign-on bonus she received from Shutterstock was more than $120,000 lower than that paid to Employee A and more than $140,000 lower than that paid to Employee B.

81. Upon information and belief, Plaintiff's salary, target bonus, and other terms of her compensation were likewise lower than those of her similarly situated male peers.

82. Following its investigation, Shutterstock reaffirmed its determination: that it was unwilling to adjust Plaintiff's compensation because the structure had been set by Meta.

83. Plaintiff resigned from Shutterstock on or around August 9, 2024.

84. To date, Defendants have failed to make Plaintiff whole.

## FIRST CAUSE OF ACTION
## VIOLATIONS OF THE FLSA § 206(d): UNEQUAL PAY BASED ON SEX

85. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

86. During the full statutory period, Plaintiff was protected by the provisions of the FLSA, 29 U.S.C. §§ 201, *et seq.*, and all applicable regulations thereunder.

87. During the full statutory period, Plaintiff performed equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility as compared to her male peers.

88. Despite this, Defendants paid Plaintiff less than her male comparators in violation of FLSA § 216(d).

89. This pay differential was not the result of a seniority system, a merit system, any system which measures earnings by quantity or quality of production, or any factor other than sex.

90. Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the FLSA.

91. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the FLSA, Plaintiff is entitled to recover damages to the greatest extent permitted by law, including, without limitation recovery of her unpaid wages, prejudgment interest on the same, liquidated damages, and reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE NYLL § 194: UNEQUAL PAY BASED ON SEX

92. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

93. During the full statutory period, Plaintiff was protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

94. During the full statutory period, Plaintiff performed equal work, under similar working conditions, on jobs requiring equal skill, effort, and responsibility as compared to her male peers.

95. Alternatively, during the full statutory period, Plaintiff performed substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions, as compared to her male peers.

96. Despite this, Defendants paid Plaintiff less her male comparators in violation of NYLL § 194.

97. This pay differential was not the result of a seniority system, a merit system, any system which measures earnings by quantity or quality of production, or any factor other than sex.

98. Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYLL.

99. As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYLL, Plaintiff is entitled to recover damages to the greatest extent permitted by law, including, without limitation recovery of her unpaid wages, prejudgment interest on the same, liquidated damages, treble damages, and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request that the Court:

A. Declare that the practices complained of herein are unlawful under applicable federal and State law;

B. Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C. Grant Plaintiff an award of damages in an amount to be determined at trial to compensate her for her economic loss;

D. Grant Plaintiff an award of damages in an amount to be determined at trial to compensate her for all non-monetary and/or compensatory damages she has suffered, including, without limitation, compensation for her mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

E. Grant Plaintiff an award of damages in an amount to be determined at trial for any and all other monetary and/or non-monetary losses she has suffered;

F. Grant Plaintiff an award of liquidated damages in an amount to be determined at trial;

G. Grant Plaintiff an award of treble damages in an amount to be determined at trial;

H. Grant Plaintiff an award of punitive damages in an amount to be determined at trial;

I. Grant Plaintiff an award of prejudgment interest where applicable;

J. Grant Plaintiff an award of reasonable attorneys' fees to the greatest extent permitted by law;

K. Grant Plaintiff an award of reasonable costs that she has incurred in this action, including, without limitation, expert witness fees;

L. Grant Plaintiff all other available damages to the greatest extent permitted by law; and

M. Grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues of fact and damages.

Dated: October 1, 2024        **GRUBIN LAW GROUP, P.C.**
New York, New York

By: _____
Alex J. Hartzband
Rita Lenane-Massey

1330 Avenue of the Americas, Suite 23A
New York, New York 10019
(212) 653-0631
ahartzband@grubinlaw.com
rlmassey@grubinlaw.com

*Attorneys for Plaintiff*